**IT IS SO ORDERED.**


**Dated:  07:53 PM  April 25 2008**

MARILYN SHEA-STONUM  *cs*
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.  **07-51884** |
| | ) | |
| **Akron Thermal, Limited Partnership**, | ) | CHAPTER  11 |
| DEBTOR(S) | ) | |
| | ) | JUDGE MARILYN SHEA-STONUM |
| | ) | |
| | ) | |
| | ) | **PARTIAL OPINION ON MOTION OF** |
| | ) | **DEBTOR AND DEBTOR-IN-** |
| | ) | **POSSESSION FOR APPROVAL OF** |
| | ) | **ASSUMPTION OF THE UNEXPIRED** |
| | ) | **OPERATING LEASE AGREEMENT** |
| | ) | **WITH THE CITY OF AKRON** |

Presently pending before the Court is the Motion of Debtor and Debtor-in-Possession

Akron Thermal , Limited Partnership ("Akron Thermal" or the "Debtor") for Approval of

Assumption of the Unexpired Operating Lease Agreement with the City of Akron (Dkt. 206) (the

"Assumption Motion") and the objection of the City of Akron (the "City") thereto (Dkt. 232).

1

The Court enforced, without extension, the deadline under Section 365 of the Bankruptcy Code for filing the Assumption Motion, although the Debtor had sought an extension of that deadline, arguing that the issues pertaining to assumption might be best addressed in the context of consideration of a reorganization plan.  The Court conducted evidentiary hearings with respect to the Assumption Motion on the following dates of this year:  January 15–16, January 31, February 1, February 19, February 22, February 26, and March 5.[1]  In the course of those hearings, it became evident that for at least a decade both the City and the Debtor had accumulated a host of unresolved issues in their dealings with each other.

Closing arguments were conducted on March 5, and the parties on various dates filed post-hearing proposed findings of fact and conclusions of law addressing different major issues. dates.  On March 20, 2008, the City filed a motion to reopen the evidentiary hearing on the Assumption Motion.[2]  In light of that motion and other issues identified below, this opinion does not reach a final decision whether the Debtor will be authorized to assume the Lease (as hereinafter defined).   The opinion does, however, address the following issues: 1) whether the term of the Lease has been extended for ten years beyond its initial term, which in the absence of renewal would have expired on August 15, 2007; 2) the amount of liquidated monetary damages that the Debtor must pay to the City in connection with any Lease assumption; and 3) whether there are other obligations that the Debtor must undertake to cure existing defaults under the

---

[1] Transcripts from the evidentiary hearings will be identified in this opinion by "Tr." and will then include the date, page, and, where appropriate, the specific transcript lines.

[2] At a status conference the following week when the Court inquired about the City's readiness to proceed on this motion, counsel for the City stated that they needed discovery and would not be ready to present evidence with regard to this motion until sometime in May.  At present a status conference is scheduled for April 29 at which counsel have been asked to present a proposed scheduling order addressing this and other unresolved issues in this case.

Lease.

Toward the goal of bringing this case to conclusion, the Court has directed the Debtor to file an amended plan of reorganization and a disclosure statement by not later than May 5. Plan feasibility is almost inextricably entwined with the question whether the Debtor can offer adequate assurance of future performance of its obligations under the Lease. The Debtor is receiving through this opinion significant clarification of its assumption obligations and must produce an amended plan of reorganization and disclosure statement that on their face establish a persuasive *prima facie* case that the Debtor will have adequate capital to: (a) make the monetary cure payments identified in this opinion; (b) perform its future obligations under the Lease; (c) return a dividend to the unsecured creditors in this case; (d) meet the Debtor's operational expenses; and (e) satisfy other plan obligations under Section 1129 of the Bankruptcy Code. The Court is taking this approach because the issues of plan feasibility and adequate assurance of future performance of lease obligations are decided with respect to the same "pie" of financial resources and the most rational approach therefore is to address both issues on a record that includes not only the evidence of financial resources introduced to date in the hearings on the Assumption Motion but also any evidence presented by interested parties with respect to plan feasibility. The Court, however, will not expend any further judicial resources on this case if the Court's review of the written amended plan and the disclosure statement leads the Court to conclude that the Debtor's claim of adequate resources is illusory. The historic chronic undercapitalization of the Debtor cannot continue.

3

**FINDINGS OF FACT** [3]

***The Parties, Their Contractual Relationships, and Prior Rulings of this Court***

1.　　Akron Thermal is an Ohio public utility operating a district energy system that generates and distributes steam throughout the downtown business district of the City, primarily for heating (the "Energy System").  Akron Thermal is regulated by the Public Utility Commission of Ohio ("PUCO").  The City is a municipal corporation organized under the Constitution and laws of the State of Ohio.

2.　　On August 15, 1997, Akron Thermal, as tenant, entered into an Operating Lease Agreement (the "Operating Lease") with the City, as landlord.  Also on August 15, 2007, Akron Thermal and the City entered into an Asset Purchase Agreement (the "APA").  Under the APA, Akron Thermal had an option to purchase and the City had an option to sell all of the assets described in the Operating Lease.  Neither party has ever exercised its option under the APA.  The parties executed two amendments to the Operating Lease:  one on May 13, 1998 (the "1998 Amendatory Agreement") and one on April 1, 2005 (the "2005 Amendatory Agreement").  The Operating Lease, the 1998 Amendatory Agreement, and the 2005 Amendatory Agreement will hereinafter be referred to collectively as the "Lease".  (The Operating Lease appears in the record as Debtor's Exhibit 1 and City's Exhibit D; the 1998 Amendatory Agreement appears as Debtor's Exhibit 11 and City's Exhibit F; the 2005 Amendatory Agreement appears as Debtor's Exhibit 12 and City's Exhibit H).

3.　　On June 13, 2007, the City hand delivered to Akron Thermal a letter captioned

---

[3] This opinion shall serve as any findings of fact and conclusions of law that may be required under Federal Rule of Bankruptcy Procedure 7052.  To the extent any finding of fact is construed on appeal to be a conclusion of law, or any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. Record citations are omitted for facts that are the subject of stipulations or have been so well-established in the Akron Thermal proceedings as to be accepted background.

4

"Notice to Leave Premises" (the "City's Notice to Leave"). That document included the statement that the City was terminating the Lease "effective Tuesday, June 19, 2007 at 9:00 a.m." Debtor's Ex. 88; City's Ex. YYY.

4.     In an oral opinion rendered on January 31, 2008, after receiving evidence on January 14 and 15, this Court held that, based upon the language of the City's Notice to Leave, the Lease had not been terminated prior to the June 18, 2007 filing by Akron Thermal of its chapter 11 petition. *See* Tr., 1/31/08 at pp. 6-40.

5.     Akron Thermal is a user of Akron municipal water and sewer services. On February 22, 2008, after receiving the briefs of the parties, the Court issued an oral ruling that Akron Thermal's pre-petition indebtedness to the City for water and sewer charges are not part of the cure required to assume the Lease, in part because the Debtor's non-payment of water and sewer charges does not constitute a failure to perform a covenant or obligation under Section 4.2 of the Operating Lease. *See* Tr., 2/22/08 at pp. 918-939.

6.     During the period subsequent to the filing of its chapter 11 petition (the "Post-Petition Period"), Akron Thermal has proffered to the City all of the rent and franchise fees then becoming due under the Lease, on a monthly pro-rated basis. For some of that period, the City declined to negotiate such payments. After the Court reiterated its view that acceptance of such interim payments would not operate as a waiver of any unresolved issues between the Debtor and the City, the City has accepted those payments. *See* Tr., 1/14/2008 at p. 290-91.

7.     The City is a user of steam provided by Akron Thermal. Although the City stopped remitting payment on Akron Thermal steam invoices in early January of the 2000 (Tr. 1/15/2008 at pp 47; Debtor's Exhibit 32), during the Post-Petition Period the City has paid all current steam invoices.

5

8.     Akron Thermal provides steam to three downtown hospitals (Akron General Medical Center, Children's Hospital, and Akron City (Summa) Hospital ("City Hospital") and to the University of Akron (the "University").   City Hospital and the University have their own back-up steam facilities, Akron General has a single emergency boiler that cannot provide 100% of the hospital's requirements, and Children's Hospital does not have any back-up facility. Although the three hospitals and the University have historically accounted for approximately 60% of the Debtor's revenues, there are nearly 200 other customers who get steam through Akron Thermal.  It seems unlikely that any of those other customers have their own steam back-up facilities.

*Extension of the Lease*

9.     On the morning of June 18, 2007, Akron Thermal provided the City with a letter captioned "Notice of Election to Renew and Extend Initial Term of Lease" (the "Akron Thermal Notice").  The Akron Thermal Notice was signed by Jeffrey Bees, President of Opportunity Parkway, LLC, as General Partner of Akron Thermal and set forth the following:

> Please be advised that under Section 2 of the Lease, Akron Thermal, Limited Partnership has elected to renew and does hereby extend the initial term for one additional period of ten (10) years.  Due to this election, the Term (as defined in the Lease) shall end on the earlier to occur of (a) the Purchase Closing Date (as defined in the Lease) or (b) the twentieth anniversary of the Lease Closing Date (defined in the Lease as August 15, 1997).

Debtor's Ex. 90; City's Ex. BBBB.  The Akron Thermal Notice was delivered to and received by at least three separate City representatives prior to the filing of the chapter 11, *see* Tr. 1/15/2008, at pp. 128-30, and the City has not contested the fact of that delivery.   Later in the day on June 18, 2007 (the "Petition Date"), Akron Thermal voluntarily filed its chapter 11 bankruptcy petition.

6

10.     On July 13, 2007, the Debtor filed Adversary Case No. 07-5138 (the "Lease Adversary Action") against the City seeking a declaratory judgment that the Lease was not terminated pre-petition and that the Akron Thermal Notice was effective in extending the term of the Lease pre-petition.

***Defaults Giving Rise to Liquidated Cure Amounts***

11.     The Debtor does not dispute that it was in default of the Lease when it delivered the Akron Thermal Notice or when Akron Thermal filed its petition. Indeed, during the period prior to the Petition Date (the "Pre-Petition Period"), the Debtor did not make any rent or franchise fee payments to the City. The parties have stipulated that at the very least the following was owed for Pre-Petition Period items: (1) $986,891.25 to the City for pre-petition rent pursuant to § 3.1 of the Operating Lease; (2) $93,035.37 to the City for pre-petition annual franchise fees pursuant to § 3.2(a) of the Operating Lease and (3) $269,073 to Summit County Ohio ("Summit County") for pre-petition personal property taxes pursuant to § 3.2(b) of the Operating Lease. The obligation as to pre-petition personal property taxes is being resolved through a payment plan agreement between Akron Thermal and Summit County. *See* Stipulations of Fact, Dkt. No. 289 ("Factual Stipulations"), ¶¶ 24 - 26.

12.     The 1998 Amendatory Agreement provided that the City and Akron Thermal would enter into a special billing arrangement for steam provided to the City by Akron Thermal. The City would prepay steam bills in the amount of $357,716.04, which the City would recover in one of two ways: through monthly application (over a two year period beginning September of 2000) of credits of up to 50% of the unadjusted monthly usage amount on the City's steam bill for that month, or, if credit amounts were still owed to the City as of September 2002, through a cash payment by Akron Thermal of the outstanding amount by no later than October 1, 2002. In

7

addition, the City was to receive a 5% discount on its various steam accounts.[4]  1998 Amendatory Agreement, § 1.

13.     The City did advance the $357,716.04 under the 1998 Amendatory Agreement, but on its books and records the Debtor did not credit any of the City's steam accounts or reduce the monthly usage invoices by the 5% discount.  Nor did the Debtor pay to the City any of $357,716.04 that remained outstanding as of September 2000.   Tr. 3/5/2008 at p. 1198.

14.     Through Mr. Robert G. Turner, Jr., a Certified Public Accountant who served as the City's expert with respect to the Debtor's financial ability to cure Lease defaults, the City offered evidence that the 5% discount on steam invoices under the 1998 Amendatory Agreement should have been in the amount of $24,683.86.  City Exhibit KKKKKK, Exhibit I (Updated Expert Report of Robert G. Turner, Jr.).   *See also* Tr. 3/5/2008 at p. 1167.

15.     The 2005 Amendatory Agreement provided for a similar special billing arrangement: the City would prepay steam bills in the amount of $200,000 and monthly credits (again, up to 50% of the monthly usage bill) were to be applied over a two year period beginning November 1, 2006, with any credit amounts owing as of October 2008 to be paid by November 1, 2008.   The City again was to receive a discount on Akron Thermal steam invoices; this agreement specifically provided that the discount would be in the amount of $10,526.  2005 Amendatory Agreement, § 1.

16.     The City did advance the $200,000 under the 2005 Amendatory Agreement, but Akron Thermal did not during the Pre-Petition Period credit any of the City's steam accounts on

---

[4]      Exhibit 1 to the 1998 Amendatory Agreement, which is a schedule of the anticipated credits and their application to particular City steam accounts, includes a 5% discount.  It therefore appears that despite the phrase "in exchange for a minimum five percent (5%) discount" used in the agreement, the discount was not anticipated to be more than 5%.

8

the Akron Thermal's books and records, nor did it apply any of the $10,526 discount to the City's steam accounts.   Tr. 3/5/2008 at p. 1198.

17.     The 2005 Amendatory Agreement recites $10,526.31 as the amount of discount in steam prices that the City was to receive through October 2008.

18.     The City contends that it is entitled to simple statutory interest on the stipulated outstanding rent, the outstanding franchise fees, and the outstanding obligations under the 1998 and 2005 Amendatory Agreements.   Specifically, Mr. Turner identified the following items of Pre-Petition Period interest[5]:  A) $291,061.08 on the outstanding rent; B) $23,146.28 on past due franchise fees; C) $221,644.83 on the $357,716.04 advanced under the 1998 Amendatory Agreement; and $8,621.94 on the steam discount under the 1998 Amendatory Agreement; and D) $26,922.22 on the $200,000 advanced under the 2005 Amendatory Agreement.[6]  City Exhibit KKKKKK and Exhibits C, D, G and H (Updated Report of Expert Robert G. Turner).

19.     The Debtor, apparently because it believes Pre-Petition Period interest is not appropriate, did not present any evidence with respect to interest calculation.

20.     On March 31, 2007 the City paid Summit County for the 2006 first half real estate taxes on Parcel #6716765 (which the parties have referred to in this case as the "RES Facility") in the amount of $32,698.26 and on Parcel # 6756875 (which the parties have referred to at times as the "BFG Facility" and at other times as the "Annex") in the amount of $3,791.29.  City

---

[5]     If interest is appropriate under the Operating Lease, nothing in the Bankruptcy Code restricts the interest calculation to the Pre-Petition Period, but no evidence was presented to the Court on those periods by the City.  In the "Legal Discussion" section of this opinion, the Court concludes that interest is appropriate with respect to monetary defaults.   The City will be allowed to introduce evidence of the amount of Post-Petition interest if this case proceeds to a combined hearing on an amended plan of reorganization and the outstanding issues under the Assumption Motion.

[6]     It is clear to the Court from Mr. Turner's report that he understood the monthly statutory interest rate calculation under Ohio Revised Code Sec. 1343.03 should be performed with reference to the federal funds rate in place for that month, as Mr. Turner used differing interest rates for different time periods in his expert report.

9

Exhibit EEEEE, Exhibits G & H (Expert Report of Robert G. Turner, Jr.).  Mr. Turner calculated the Pre-Petition Period interest on the 2006 first half tax payments to be $784.35 for the RES Facility and $90.94 for the BFG Facility.

21.     On July 16, 2007, the City paid Summit County for the 2006 second half real estate taxes on the RES Facility and the BFG Facility in the amounts, respectively, of $32,698.26 and $ 3,791.29.  *Id.*

22.     Whether the real estate taxes advanced by the City constitute additional cure amounts pursuant to the Debtor's assumption of the Lease is addressed below in the Court's Conclusions of Law, as is the question whether the City is entitled to interest on the Debtor's past-due monetary obligations under the Lease.

**Pre-Petition Conduct of the City Regarding Known Defaults**

23.     At no time during the nine years and ten months between execution of the Operating Lease and delivery of the City's Notice to Leave did the City make any formal written demand for past due rental or franchise fee payments.

24.     At the time the Amendatory Agreements of 1998 and 2005 were signed, Akron Thermal was in arrears on all of its rental and franchise fee obligations under the Operating Lease, but the City did not condition its "prepayment" of steam bills upon Akron Thermal's payment of all or any part of those past due payments.

25.     On July 15, 2004, the City provided its unconditional consent to the transfer of the general partner interest in Akron Thermal from Thermal Ventures, Inc. to Thermal Ventures II, L.P (the "Present General Partner").  *See* Debtor's Ex. 42.  The City did not require Akron Thermal to pay the past due rent or franchise fees prior to the City's delivery of the letter consenting to the transfer of the general partner interest.

10

26.     At various times prior to the Akron Thermal's filing of a chapter 11 petition and during or after the transfer of the general partner interest to the Present General Partner, Akron Thermal and the City negotiated towards a resolution of all the claims between them.   It was the understanding of the Present General Partner prior to receiving the City's Notice to Leave that the City would not require, as part of that resolution, immediate payment of all outstanding rent and franchise fees.   Until at least February of 2007, the Present General Partner also believed that the City would allow Akron Thermal to continue as the operator of the Energy System. Debtor's Exhibit 71.  Tr. 1/14/2008 at pp. 108-11.  The City witnesses have acknowledged that there were negotiations with Akron Thermal over a long period of time, but no City representative admitted to making any firm commitments with respect to deferral of past due rent and franchise fees or to Akron Thermal's continued operation of the Energy Systems.  In fact, in a letter dated June 8, 2007, Mayor Donald L. Plusquellic strongly denied any such commitments. Debtor's Exhibit 83.

*Deferred Maintenance*

27.     At present the Debtor regularly operates the following boilers:  Boiler 32 at the BFG Facility/Annex and Boilers 1 and 2 at the RES Facility.[7]  Boiler 32 is a coal-fired spreader stoker boiler, which burns coal that is fed by a spreader onto a grate moving through the boiler. *See* Tr., 2/22/08 at p. 737, lines 1-8.  In 2005, Akron Thermal installed a wood chip and "Tire Derived Fuel" feed system for Boilers 1 and 2, which currently burn a mixture, by weight, of 90% wood chips and 10% tire derived fuel.  City Exhibit LLLL at §10.2.

28.     The Debtor has three separate departments of employees whose job responsibilities consist primarily of maintaining the Energy System: 1) a Maintenance Department (7 employees); 2) an Elect-Tech Department (4 employees); and 3) a Distribution Department.  The Maintenance Department bears primary responsibility for routine and major maintenance, the Elec-Tech Department handles the installation and maintenance of instruments and electrical components, and the Distribution Department is responsible for maintaining the distribution lines.   Tr. 2/19/2008 at pp 595-57, 677.

---

[7] Akron Thermal holds licenses to operate two other boilers, but those are not currently in normal operation (Boiler 3 serves as an emergency backup boiler at the RES Facility and Boiler 31 serves that same role at the BFG Facility). These boilers were not the focus of evidence relating to the Assumption Motion.

12

29.     Akron Thermal employees are not unionized.  Therefore, employees from Akron Thermal's operations department who also have experience or training in maintenance work assist the Maintenance Department when available.  Specifically, it is the normal practice of Akron Thermal to shut down Boilers 1 and 2 in the summertime and to operate only on Boiler 32 at the BFG Facility/Annex.  During that shutdown, auxiliary and loader operators will work on maintenance overhaul on the RES boilers and other equipment.  Tr. 2/19/2008 at pp 596-97. Then when Boiler 32 shuts down (usually in the fall), the auxiliary operator for that boiler will assist the Maintenance Department with Boiler 32's overhaul.  *Id* at 677.

30.     The City's expert witness on maintenance issues was Mr. A.D. Conley of CODACO Engineering.  Mr. Conley authored a draft report of Municipal Steam System Condition Assessment dated June 2007 (the "CODACO Draft Report") and a Municipal Steam Condition Assessment Follow-Up dated November 2007 (the "CODACO Follow-up Report"). City's Exhibit LLLL.

31.     In Section 2.0 (Page 1) of the "Executive Summary" for the CODACO Draft Report, Mr. Conley concluded that three major components of the Energy System, consisting of the RES Steam Plant and two components of the Distribution System "are in a state of disrepair and requires *[sic]* major equipment maintenance to be performed in the near future."  This section of the CODACO Draft Report also concluded that, if the RES Facility and portions of the Distribution Energy System (as defined in that report) were not maintained within a short period of time, the lack of maintenance would affect the total Energy System's reliability, steam cost, reliability of providing steam to all of the customers, and in some instances create, "operational safety hazard[s]".

13

32.     Mr. Conley's assessment of the maintenance needs at the RES Facility changed somewhat dramatically after he revisited the site in late October of 2007.  The Executive Summary for the CODACO Follow-up Report acknowledged that "the maintenance performed by [Akron Thermal] since March, 2007 will greatly improved [*sic*] the operations and reliability, integrity, of the total Steam System for the winter of 2007-2008." § 2.2.   In his testimony, Mr. Conley stated that the Energy System was in fair condition for the 2007-08 heating season, that this condition was acceptable in his judgment, Tr. 1/31/2008 at p. 98, lines 22-24, and that with respect to routine maintenance he thought "the personnel there do a wonderful job."  *Id.* at p. 130, lines 13-14.

33.     Mr. Conley's report and opinion estimated maintenance costs were based upon hiring a third party to do all the work, but Akron Thermal uses its own employees for many of the items that Mr. Conley identified as maintenance required over the next five years. Mr. Conley acknowledged, for example, that Akron Thermal actually performs some of the yearly boiler maintenance at the BFG Facility that Mr. Conley identified as "major maintenance".  *Id.* at p. 140.

34.     Mr. Wade Woods, the Akron Thermal Assistant General Manager,  and Mr. Richard Pucak, the General Manager, both described for the Court the annual process at Akron Thermal for evaluating and meeting maintenance needs.  Tr. 2/19/2008.  Debtor's Exhibit 108 summarizes the significant expenditures that Akron Thermal has made from 2004 through November of 2007 for regular maintenance, major maintenance, and capitalized maintenance.

14

35.     As in the CODACO Draft Report, in the CODACO Follow-up Report Mr. Conley recommended installation or repair of "automatic controls" on Boiler 1 as follows: "fuel feed (both solid fuel and natural gas), combustion systems (oxygen, carbon dioxide, etc.), air flow (both primary and secondary), and feedwater flow." Report §2.1.3 (C). The Follow-Up Report later refers to automatic controls for both Boiler 1 and 2. Report §2.4. In his testimony, Mr. Conley explained that he was recommending an "overall" automatic control system that "integrates each boiler's operation not only individually but then it integrates the boilers and their systems, sub-systems, say, as a total." Tr. 1/31/2008 at pp. 158-59. Mr. Conley testified that the automatic controls in place were "obsolete," which he defined to mean "nobody would install a system like that anymore." *Id. at* p. 88.

36.     It appears from Section 4.0 of the Executive Summary in the CODACO Follow-up Report that Mr. Conley estimated maintenance costs for 2008 in the approximate amount of $3.15 million. That section further states that without new automatic controls for the RES Facility, the estimated maintenance costs for 2008 would be $1.65 million. According to Debtor's Exhibit 108, this amount is less than the amount that Akron Thermal has spent in prior years for maintenance. The Debtor has scheduled $2.6 million in maintenance expenses for 2008. Tr. 2/19/2008 at 692.

37.     Mr. Thomas Smith (an engineer employed by the City who worked at the RES Facility from 1980 to 1995 as liaison for the City) testified that the "Micon program logic control" system in place when he left the RES Facility had been installed in 1983 at the time the boilers were converted to a trash burning system because boilers running on trash have stability problems. Tr. 1/31/2008 at p. 471. Akron Thermal does not presently operate any of the boilers to burn municipal trash; nor has Akron Thermal ever processed trash as fuel. *Id*. at p. 52.

15

38.     The Akron Thermal witnesses testified that a fully automatic controlled system is not necessary to produce sufficient steam for the Akron Thermal customers. *See, e.g.* Tr., 1/31/08 at pp. 187-190; Tr., 2/19/08 at pp. 600-601.  Indeed, the City's expert witness acknowledged that the existing boilers are still firing and they are still operational under manual control. Tr. 1/31/2008 at 159, 164.  Mr. Pucak indicated that the automatic controls recommended by Mr. Conley might not even provide increased efficiency for boilers run on wood chips mixed with tire derived fuel. Tr. 2/19/08 at pp. 600-01.  Mr. Jon Belcher (the Thermal Engineering employee who served as the Debtor's expert on maintenance issues) testified that he considered the automatic control system included in the CODACO Draft and Follow-Up Reports to be "an upgrade of an existing system that's functioning."  Tr., 1/31/08 at p. 186, lines 7-8. He further noted that automatic controls work best when boilers burn gas or a liquid fuel because the content of that fuel is fairly consistent but automatic controls can actually create problems when used with boilers that move solid fuel.  Finally, Mr. Belcher testified that he had described the Akron Thermal operations to a company that makes automated control systems and that company indicated that adequate automated controls could be installed for an estimated $400,000 to $500,000, far less than the $1.5 million included by Mr. Conley in the Follow-Up CODACO Report.   Tr., 1/31/08 at pp. 187-90.

39.     Based upon the testimony set forth above at Paragraphs 37-38, the Court finds that installation of the replacement automatic controls recommended by Mr. Conley is not necessary for Akron Thermal to effectively operate Boilers 1 and 2.

40.     Both of Mr. Conley's reports recommended raising the "header" on Boiler 2 in the RES Facility as had previously (prior to Akron Thermal's involvement with the Energy System) been done to Boiler 1 to rectify a problem with water circulation in tubes contained

16

within the furnace wall attached to the feed chute header.  Mr. Belcher testified that because Akron Thermal consistently runs Boiler 2 at 100% of its capacity, the pressure in the water tubes was sufficient to maintain circulation and raising the header was not necessary.  Tr. 1/31/2008 at pp. 193-94.  Moreover, the testimony from Mr. Conley and Mr. Smith indicates that the problem with Boiler 1 related to the era when the boiler was burning municipal trash; neither of these individuals provided a compelling reason why under the present operations the header on Boiler 2 should be raised.

41.    At various times while Akron Thermal has operated the Energy System, there has been a functioning condensate[8] return line from Akron City Hospital (Summa) which joined the condensate return line from the University (the "City Hospital Condensate Return Line").  At all times under Akron Thermal's operation of the Energy System, there has been an operating condensate return line from the University to the RES Facility (the "University Condensate Return Line").

42.    The City Hospital Condensate Return Line is not currently in operation due to leaks.  The pipe is part of the very old "Rickwell" system (so named for its manufacturer). Apparently the leaks are for the most part attributable to electrolysis, which has caused corrosion from the "outside in," which is to say that the first damage occurs to the outer casing pipe of the condensate return line and then to the inner pipe that actually carries the condensate.  Tr. 2/19/2008 at p. 683.

43.    Before making the decision in 2007 to shut down the City Hospital Condensate Return Line, Akron Thermal attempted to resolve the leak issues by "slip lining" (*i.e.,* inserting a new piping in between the outer casing and the pipe that carries the condensate) 200 feet of the

17

City Hospital Condensate Return Line. Tr. 2/19/2008 at p. 684. But new leaks in other sections of the line began to show up and when the City Hospital Condensate Return Line was taken down to allow for additional slip lining, the steam services to City Hospital also had to be interrupted. Mr. Pucak testified that in 2006, while Akron Thermal was still attempting to preserve the City Hospital Condensate Return Line as part of a closed loop system, City Hospital was off the system for approximately 60 days. After that line was shut down in 2007 there were only a little over 20 days on which service to Akron City was interrupted. *Id.* at pp. 682, 684.

44.    Mr. Smith testified that in 1995 when he left his position as City liaison to the RES Facility, the City Hospital Condensate Return Line was functioning. Tr. 2/19/2008 at p. 508. Mr. Pucak testified, however, that the University and City Hospital were not on the system when Akron Thermal took over the steam operations in 1995 (pursuant to an interim license and operating agreement), that City Hospital came onto the system in late 1995, and that the University did not come onto the system until September of 1998. Tr. 2/19/2008 at 698. No witness addressed the specific question whether the City Hospital Condensate Return Line was operational in 1997 when the Operating Lease was signed.

***The Notice of Violation from the USEPA***

45.    The Debtor has licenses to operate five boilers with a combined maximum heat input rating of 1027 million (MM) Btu/hr. Three boilers are in regular operation, including Boiler 32, which is a 220 million Btu/hr coal-fired spreader stoker boiler.

46.    Boiler 32 is the subject of a Notice of Violation from U.S. EPA dated February 15, 2005 and appearing in the record as Debtor's Exhibit 149 (the "Boiler 32 NOV").

---

[8] Condensate is the hot water resulting as the steam cools after delivery to customers.

18

47. Mr. Charles M. Taylor testified as an expert witness for Akron Thermal on the environmental issues raised by the Boiler 32 NOV. The Court found Mr. Taylor to be a very well informed and credible expert. Debtor's Exhibit 163 is a timeline prepared by Mr. Taylor on regulatory issues and events relating to Boiler 32 and Exhibit 130 is one of the export reports authored by Mr. Taylor for this case.

48. Boiler 32 was constructed and installed by the BF Goodrich Company ("BFG") prior to the enactment of the federal Clean Air Act. Debtor's Exhibit 163.

49. Since the early 1970's, the Ohio Environmental Protection Agency ("Ohio EPA"), under a delegation of authority from the U.S. Environmental Protection Agency ("U.S. EPA") under the federal Clean Air Act, has been the primary authority for issuing air pollution permits in Ohio. The Akron Air Agency is retained by Ohio EPA to implement air pollution control rules and permitting in Medina, Portage and Summit counties. *See* Tr., 2/22/08 at p. 798, line 21 to p. 799, line 6. Debtor's Exhibit 130, § 3.0.

50. In 1988, when BFG closed its tire manufacturing plant, it sold Boiler 32 to the City. Debtor's Exhibit 163.

51. In February of 1988, the Akron Air Agency wrote to the City to confirm that Boiler 32 was on emergency standby basis to be used as a backup to the other four boilers and that registration status was recommended. In March of 1988, Ohio EPA issued a Notice of Registration, which is issued in lieu of a permit to operate, for Boiler 32. Debtor's Exhibit 163.

52. In 1995, after taking over the operation of the Energy System under an interim agreement with the City, Akron Thermal through its general partner and through the City made inquiries whether the permit to operate Boiler 32 could be reinstated. On August 23, 1995, the

19

Akron Air Agency sent the City a letter stating that the registration status would cover Boiler 32 until the anticipated new permit program under Title V of the Clean Air Act was implemented. *See* Debtor's Ex. 147; Tr., 2/22/08 at p. 1006, lines 2-18; Debtor's Exhibit 130, § 3.4.

53. The Ohio EPA process for issuing major air emission source Title V permits is multi-phased: it begins with a draft permit, followed by a preliminary proposed permit, then a proposed permit, and finally a final permit. The purpose of this multi-step process is to provide the applicant, the public and U.S. EPA the opportunity to review and comment on—and in the case of U.S. EPA to object to—the permit before it is issued. *See* Tr., 2/22/08 at p. 800, lines 9-14;   p. 830, line 23 to p. 831, line 14.  The Title V operating permit, when finally issued, is enforceable by Ohio EPA as well as U.S. EPA.  *See* Tr., 2/22/09 at p. 822, lines 1-2; Debtor's Exhibit 130, §3.

54. In September of 1996, Akron Thermal applied for a Title V permit for five boilers at the RES and BFG Facilities, including Boiler 32.  A draft permit was issued on April 30, 1998, a proposed permit on December 3, 1998, and the final permit was issued February 4, 1999. *See* Tr., 2/22/08 at p. 825, line 4 to p. 826, line 20; Debtor's Exhibit 130, § 3.4; Debtor's Exhibit 163; Debtor's Exhibit .

55. The ultimate permit allowed sulfur dioxide ("$SO_2$") emission of 7.0 pounds per million Btus and nitrogen oxide ("NOX") emissions were not limited at all. *See* Tr., 2/22/08 at p. 825, line 4 to p. 826, line 20; Debtor's Exhibit 134, p. 10 (page also identified as "ATLP-Lease1256"); Debtor's Exhibits130 (§3.4) & 163.

56. During the initial Title V permit process, U.S. EPA never raised any objection to these permit limits, did not suggest that Boiler 32 had to meet BACT or otherwise comply with any "new source performance standards" ("NSPS") or "prevention of significant deterioration"

20

("PSD") regulations, and the permit was issued as final on February 4, 1999. Debtor's Exhibits 130 (§ 3.4) & 163.

57.     The initial Title V permit expired on February 4, 2004. *See* Tr., 2/22/08 at p. 823, line 20 to p. 824, line 2.   In accordance with the permit terms, Akron Thermal submitted a renewal application on March 28, 2003, which was processed by Ohio EPA (and the Akron Air Agency) in the same manner as the original permit: draft, preliminary proposed, proposed and final. As was the case with the original permit, the renewal authorized Boiler 32 as an existing source, with the same emissions limitations. *See* Tr., 2/22/08 at p. 827, lines 7-9; Debtor's Exhibits 130 (§ 3.4) & 163.

58.     In October of 2003, the U.S. EPA, through the Director of the Air and Radiation Division, Region 5, sent Akron Thermal an information request under Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a).  Debtor's Exhibit 136.  Akron Thermal responded in November of 2003.  Debtor's Exhibit 137.

59.     U.S. EPA did not object to, or otherwise comment on, the emissions limitations in Akron Thermal's application to renew its Title V permit.  The renewed permit became final on January 30, 2004, and will terminate on January 30, 2009.   *See* Debtor's Ex. 138; Tr., 2/22/08 at p. 831, line 19 to p. 832, line 8; Debtor's Exhibit 130, §§3.4-3.6.

60.     For the period that Akron Thermal has operated Boiler 32, a cyclone separator and an electrostatic precipitator ("ESP"), which are used for the removal of particulate emissions, have been the only air pollution control devices required by Ohio EPA (or the Akron Regional Air Agency).  *See* Tr., 2/22/08 at p. 746, line 19 to p. 747 line 4.  Akron Thermal has complied with these requirements.  *Id.* at p. 826.

61.     The $SO_2$ limit for Boiler 32 in Akron Thermal's Title V permit was set on the

21

basis of air quality modeling under the National Ambient Air Quality Standards ("NAAQS"); that modeling did not suggest that operation of Boiler 32 would cause the air quality in Summit County fall below acceptable quality under NAAQS. *See* Tr., 2/22/08 at p. 826; p. 896, lines 17-24.

62.     The amount of $SO_2$ emitted by all of Akron Thermal's boiler operations (as measured during a stack test completed in March 2007) is less than one-seventh of the rate allowed by the Title V permit.   Tr., 2/22/08 at p. 897, lines 16-19; Debtor's Exhibit 140.

63.     In 2005, there were approximately 130 boilers in Ohio that had more sulfur dioxide emissions than Boiler 32, which is only responsible for approximately 0.1% of the total $SO_2$ emissions in Ohio. *See* Tr., 2/22/08 at p. 808, lines 16-19; p. 809, line 18.

64.     Boiler 32 contributes a much smaller percentage of the total NOX emissions in Ohio than it does of $SO_2$. *See* Tr., 2/22/08 at p. 814, lines 16-20.

65.     U.S. EPA and Ohio EPA determined that an emission limitation on NOX for Boiler 32 was not necessary to ensure that the NAAQS would be met in Summit County. *See* Tr., 2/22/08 at p. 826, lines 12-20.

66.     In the Boiler 32 NOV, the U.S. EPA asserts Boiler 32 was a modified or "new use" source at the time Akron Thermal resumed operation of that boiler in 1995 and that Boiler 32 was therefore subject to NSPS and PSD analysis.  Debtor's Exhibit 149.

67.     If Boiler 32 was a modified or "new use" source at the time it resumed operations, Akron Thermal was required to install best available control technology ("BACT"), which is another term of art under the Clean Air Act.

68.     On March 3, 2005 and again on June 30, 2005, representatives of Akron Thermal, including its environmental counsel (Squire, Sanders and Dempsey, through Mr. James Allen)

22

met with U.S. EPA to discuss the Boiler 32 NOV. *See* Tr., 2/22/08 at p. 1024, line 10 to p. 1027, line 16. On July 28, 2005, Mr. Allen wrote to U.S. EPA (the "Akron Thermal NOV Response"), arguing in detail that the reactivation of Boiler 32 in 1995 did not constitute the installation of a new source or the modification of an existing source such that compliance with the NSPS or the installation of BACT was required. *See* Tr., 2/22/08 at p. 840, lines 8-11; Debtor's Ex. 151; Tr., 2/22/08 at p. 968, lines 3-18.

69.     In December of 2006, pursuant to negotiations with U.S. EPA, Akron Thermal agreed to perform a stack test of Boiler 32 and undertake a BACT analysis. *See* Debtor's Ex. 154.

70.     The stack test was completed on March 1, 2007 and was later provided to U.S. EPA, Ohio EPA and the Akron Air Agency. *See* Debtor's Ex. 140; Tr., 2/22/08 at p. 1032, line 19 to p. 1033, line 5.

71.     On July 27, 2007, the Department of Justice ("DOJ"), on behalf of U.S. EPA, sent a letter to Squire Sanders & Dempsey (by now Akron Thermal's former environmental counsel[9]) explaining the position of the U.S. EPA that Debtor should install selective catalytic reduction ("SCR") to achieve a NOX limit of .06 lbs per million BTUs; and a wet scrubber to reduce sulfur dioxide emissions by 97%. *See* Debtor's Ex. 158 (the "DOJ Letter"). It appears this was the first written response by the U.S. EPA to the July 2005 letter sent by Squire Sanders & Dempsey

---

[9] At some point after Akron Thermal filed its petition in bankruptcy, the City revoked a prior conflict waiver and objected to Squire Sanders & Dempsey remaining as Debtor's environmental counsel. This decision by the City required Akron Thermal to retain new environmental counsel who had to become familiar with the entire matter before they could knowledgeably advise Akron Thermal or knowledgeably negotiate on Akron Thermal's behalf. Tr., 2/22/08 at p. 1033, line 13 to p. 1034, line 6. The Court therefore does not agree with the City's suggestion that Akron Thermal has been dilatory in attempting to resolve this issue with U.S. EPA.

in response to the Boiler 32 NOV and was also the first time that U.S. EPA had specified the limits on $SO_2$ and $NO_X$ emissions it was expecting Akron Thermal to meet.

72.     Akron Thermal engaged Aegis Environmental Inc. in 2006 to undertake a BACT analysis on Boiler 32.  This project was interrupted for a fairly long period of time, but was completed on December 4, 2007, and subsequently provided to U.S. EPA. *See* Debtor's Ex. 157; Tr., 2/22/08 at p. 1033, lines 6-12.

73.     Mr. Charles M. Taylor testified as an expert witness for Akron Thermal on the environmental issues raised by the Boiler 32 NOV.  The Court found Mr. Taylor to be a very well informed and credible expert.  Prior to testifying, Mr. Taylor reviewed a list of work that Akron Thermal performed on Boiler 32 as part of its restart.  *See* Debtor's Exhibit 159 (affidavit of David Toombs, Akron Thermal's general manager in 1995).  Mr. Taylor opined that the U.S. EPA is wrong when it concludes that Akron Thermal's resumption of Boiler 32 operations in 1995 constituted "new use" or "modification" that triggered an obligation to install BACT.  Tr. 2/22/2008 at pp. 832-34; *id.* at p. 980.

74.     While the City presented several expert witnesses relating to the Boiler 32 NOV, it did not present any expert testimony on the threshold question whether resumption of Boiler 32 operations in 1995 constituted a "new use" or "modification" giving rise to BACT obligations.  So, for example, the opinion of the City's expert on environmental engineering (Mr. Rick L. Lausman of Black & Veatch) identifying air pollution control equipment costs in the neighborhood of $18 million (with additional annual operation costs of approximately $3 million) assumed that the U.S. EPA was correct in asserting that the resumption of Boiler 32 operations in 1995 constituted a new use or modification triggering NSPS and BACT under the Clean Air Act.  Similarly, the BACT analysis prepared at the Debtor's request by Aegis, which

24

concluded that BACT equipment and installation for Boiler 32 would cost approximately $ 7 million (with additional annual operation costs of approximately $1.6 million), did not analyze whether the events of 1995 created BACT requirements that previously had not applied to that equipment's operation.

75.     If Akron Thermal does not prevail on the new use/modification issue, the current limit for sulfur dioxide for emission devices such as Boiler 32 is 90% under the NSPS and the limit for NOX is .3 lbs per million BTU.  Mr. Taylor testified that these limits can be achieved by using a dry scrubber for $SO_2$ reduction and flue gas recirculation for NOX control.  *See* Tr., 2/22/08 at p. 916, lines 3-10; p. 917, lines 1-8; p. 1036, lines 4-12.

76.     Akron Thermal has recently received a quotation from KLM Co. for the air pollution control equipment on Boiler 32, as well a quotation for the cost to install the KLM Co. air pollution control equipment.  The total cost to purchase and install the KLM Co. air pollution control equipment is approximately $1.8 million.   Debtor's Ex. 165; Tr., 2/22/08 at p. 1048, line 25 to p. 1051, line 15.   The Debtor has advised the U.S. EPA of the KLM Co. proposal and is awaiting a response whether U.S. EPA would accept installation of the equipment as a resolution of the Boiler 32 NOV.  Tr., 2/22/2008 at p. 1043.

77.     In the absence of a financially viable settlement with U.S. EPA regarding the definition of BACT for Boiler 32, Debtor intends to contest the U.S. EPA's conclusion that it converted Boiler 32 to a "new use" or "modified" emission device in 1995.   Tr., 2/22/2008 at p. 1036.

78.     The City did not present any evidence that it has paid any money to achieve the emissions standards described in the DOJ Letter or that the U.S. EPA has pursued any enforcement action against the City with respect to Boiler 32.

25

79.     Akron Thermal does not have the financial resources to pay any significant civil penalty relating to the Boiler 32 NOV.  All of the experts testifying with respect to the Boiler 32 environmental issue agreed that ability to pay is considered by the U.S. EPA when it determines whether to seek imposition of a civil penalty and one of the City's experts conceded that he was not aware of any U.S. EPA administrative order that included a civil penalty that caused a company to go out of business.  Tr., 2/1/08 at p. 434, line 8-14.

80.     The City owns the real property and equipment that Akron Thermal leases and, as a result, could have some liability for violations of the Clean Air Act *if* operation of Boiler 32 beginning in 1995 is ultimately found to have violated the Clean Air Act.

81.     Although there was evidence at the hearings that Cleveland Thermal was vying for the operation of the Energy System, the City did not present any evidence that Cleveland Thermal was aware of the environmental costs that the City asserts need to be spent before Boiler 32 will satisfy the emissions specifications set forth in the DOJ Letter.  Nor has the City suggested that it would step in to make these changes.

# LEGAL DISCUSSION

### A.    *The Lease Extension Issue*

#### 1.    *The Debtor Extended the Initial Term of the Lease on June 18, 2007 prior to Filing its Chapter 11 Petition*

Section 2 of the Operating Lease provides in its entirety:

> **Section 2.  Term.**  The term (the 'Term" of this Lease shall commence on the date of this Agreement (the "Lease Closing Date") The initial term of this Lease shall be for ten (10) years commencing on the Lease Closing Date and Tenant shall have the right to renew and extend the initial term for one additional period of ten (10) years.  The Term shall end on the earlier to occur of (a) the Purchase Closing Date or (b) the tenth anniversary of the Lease Closing Date or in the event that the Tenant has elected to extend the term for an addition ten (10) years, on the twentieth anniversary of the Lease Closing Date, unless earlier terminated pursuant to the provisions of this Lease**.**

Rather surprisingly, nothing in the Operating Lease purports to condition the tenant's right to renew and extend the term length from the initial term of ten years to a twenty year term.

Akron Thermal clearly attempted to exercise an election to "renew and extend" the initial term of the Lease by delivering the Akron Thermal Notice to the City before filing its chapter 11 petition.  The City, however, argues that this attempted extension was ineffective because this Court should imply into Section 2 of the Operating Lease a condition that the tenant cannot extend the lease term at a time when the tenant is not in substantial compliance with its lease obligations.

In its proposed conclusions of law, the City relies upon three state court opinions:  *Horn v. Lapille*, 1984 WL 6969 (1st Dist.), *Urbanski v. Szelaszkiewicz*, 15 Ohio App. 4 (6th Dist. 1921), and *Parry's Heirs v. Tobacco Ins. Co.*, 1871 WL 4609 (Super. Ct. Ohio 1871).   As explained in its oral opinion of January 31, 2008, this Court does not consider these opinions to be

27

controlling.[10]  Nor has the Court found any other opinions of Ohio courts addressing the question whether to imply substantial performance as a condition precedent to an extension of the lease term.

The Court believes that if the Supreme Court of Ohio were presented with the question whether Akron Thermal effectively extended the Lease on June 18, 2008 (prior to filing its chapter 11 petition), it would resolve the issue in favor of Akron Thermal.  The City has not argued that the Lease extension terms are ambiguous or that those terms need to be reformed because they mistakenly expressed the mutual intent of the parties.  Absent ambiguity or mutual mistake, Ohio courts have refused to augment or revise lease terms on the grounds that the contract was imprudent.  As the court said of a clear, unequivocal and unambiguous contract provision in *Selzer v. Turske*, 30 Ohio App. 15, 164 N.E. 65 (8th Dist. 1928):

> It was a contract made by the parties, and, if they were foolish enough to make such a contract, it is not up to the court to make another contract for them.

*Id.* at 19, 164 N.E. at 66.  *See also Genchur v. Chopko*, 1991 WL 186496 at *4 (Ohio App. 11 Dist. 1991) ("very practically, it could and should be said that if, at the time this lease was executed, the parties did not intend certain things, then their intentions should have been spelled out in the written contract").

The Operating Lease was negotiated in the mid 1990's by two sophisticated parties who were, according to the notice provisions in that document, represented by knowledgeable

---

[10]     The Operating Lease provides in Section 29 that the internal substantive law of Ohio governs "in all respects".  In deciding issues founded upon state common law, federal courts should look to the decisions of the state's highest court. If the state's highest court has not spoken to the question in controversy, a federal court must discern how the state's highest court would respond if confronted with the question.  *See In re* Ritchey, 84 B.R. 474, 476 (Bankr. N.D. Ohio. 1988).  Therefore, in addition to the reasons that this Court articulated in its January 31, 2008 oral opinion, the fact that the City's cases were not authored by the Ohio Supreme Court but rather by lower state courts argues that those opinions do not control the lease extension question.

28

counsel.  Language precluding a right to extend or renew if the tenant is in default under the lease is neither hard to draft nor unusual:  that language almost undoubtedly exists in every real estate attorney's "form files" for commercial leases.[11]  It is therefore more likely than not that the silence in the Lease with respect to requirements for lease extension resulted from arms-length negotiations.  If the City was unwilling at the time of lease negotiation to insist that the extension right be conditioned on compliance with other terms of the Lease, it is not now up to this Court to save the City from that decision by writing such a condition into the document.  *Cf. F & L Center Co. v. Cunningham Drug Stores,* 19 Ohio App.3d 72, 75 (8th Dist. 1984) (where parties' written lease did not limit landlord's discretion in approving assignment of lease, the court would not impose such a condition).  Moreover, reading a substantial performance condition into the document further would be totally inconsistent with the integration *and* severability clauses in the Operating Lease.[12]

---

[11]        The fact that most commercial leases would condition, with express language, the right to extend or renew upon the tenant's compliance with other terms in the lease probably explains the dearth of modern Ohio opinions dealing with the issue whether the law should imply a condition of substantial performance.

[12] Section 22 of the Operating Lease provides in relevant part:

Entire Contract.  This Lease, together with the Schedules hereto, the Purchase Agreement and other related agreements referred to herein or therein, is the entire contract between the parties relating to the subject matter hereof, and supersedes all prior and contemporaneous negotiations, understandings, and agreements, written or oral, between the parties . . . .

Section 28 of the Operating Lease provides in relevant part:

Severability.  Each article, section, subsection, and lesser section of this Lease constitutes a separate and distinct undertaking, covenant, and/or provision hereof.

29

The Court also has considered the opinions the City cites from jurisdictions other than Ohio. Under the facts of this case, however, the Court is not persuaded by those authorities that a substantial compliance requirement should be superimposed on Section 2 of the Operating Lease. First, it is not clear that the leases in those opinions contained a severability clause. Given that clause in the Operating Lease, it is hard to construe the extension provision as anything other than an independent right of the tenant to extend the lease term. And where there are independent covenants for renewal or extension, many courts have held that tenant defaults under other lease covenants do not bar exercise of the renewal right[13]. *See, e.g., Darling Shop of Birmingham, Inc. v. Nelson Realty Co., Inc.*, 255 Ala. 586, 591, 52 So.2d 211, 215 (1951) (citing 51 C.J.S. Landlord and Tenant, § 62, p. 608; 32 Am.Jur. p. 817) ; *Parham v. Glass Club Lake, Inc.*, 533 S.W.2d 96, 99 (Tex. 1976) *See generally Right to Exercise Option to Renew or Extend Lease as Affected by Tenant's Breach of Other Covenants or Conditions,* 23 A.L.R.4[th] 908 § 2 ("[w]here the covenants and agreements on the part of the lessee contained in the original lease are independent of the lessor's covenant to renew, a breach thereof by the lessee will not release the lessor from his obligation to renew or extend").

---

[13] In what the Court considers a somewhat analogous modern Ohio opinion, the reviewing court in *Genchur v. Chopko, supra,* held that a lessee's option to purchase the leased property was independent of the lessee's right of first refusal and the option could be exercised at the lease price even though the lessor had received a significantly higher purchase offer and had attempted to invoke the right of first refusal procedures under the lease: "We agree with the trial judge that the two clauses in question are unambiguous and are independent covenants. We further find that nothing in the contract expressly extinguishes the one clause by the exercise of the other clause. " 1991 WL 186496 at p. 3.

Second, and perhaps more importantly, the rationale for those decisions cited by the City clearly sounds in equity. *See, e.g.* City's Proposed Conclusions of Law (Dkt. 362) ¶ 58 (it is "fundamentally unfair to require a landlord to renew a lease when rental payments are uncertain.") (quoting *Horn v. Lapille*, 1984 WL 6969 (1st Dist. Hamilton Cty), which in turn quotes *Hindquarter Corp. v. Property Development Corp.*, 631 P.2d 923, 926 (Wash. 1981)); *id.* at ¶ 66 (" '[i]t would be inequitable or improper to require a landlord to extend the lease when the tenant was proved to be an undesirable tenant and has violated covenants contained in the lease for the protection of the landlord'") (quoting Hindquarter, *supra,* at 926).. Rewriting a contract negotiated by sophisticated parties, however, entails a slippery slope that this Court declines to step upon.

Moreover, such recourse to principles of fairness invites the Court to consider the Debtor's waiver and estoppel arguments. If this Court were to go down the fundamental fairness route, then despite the anti-waiver clause in Section 20 of the Operating Lease,[14] the Court would

---

[14]       Section 20 of the Operating Lease provides:

<u>Waiver.</u>  No consent or waiver, express or implied, by either party hereto with respect to any breach or default by the other party hereto in the performance of any of the covenants or obligations of such other party hereto under this Lease shall be deemed or construed to be a consent to or waiver of any other such breach or default. Failure or delay on the part of either party hereto to complain of any act (whether of commission or omission) of the other party hereto or to declare a breach of or default under this Lease, irrespective of how long such failure or delay continues, shall not constitute a waiver by such party hereto of its rights hereunder. No waiver by either party hereto of any default or breach by the other party hereto in the performance of any of the covenants or obligations of such other party hereto under this Lease shall be deemed to have been made by such party unless contained in a writing executed by such party hereto.

also consider the facts and authorities cited by Akron Thermal in support of its argument that the City waived any substantial compliance condition that might otherwise be implied or is barred by estoppel from enforcing such a condition. The City cannot have it both ways: if this Court is free to augment the terms of Section 2 of the Operating Lease under principles of "fundamental fairness", then it would probably be free to balance against such augmentation the fundamental fairness factors weighing against a substantial compliance condition. The City never, over the course of nearly ten years prior to delivery of the City Notice to Leave, made formal demand for past due rent or franchise fees. Not even in July of 2004 --when the Present General Partner requested the City's unconditional consent to the transfer of the general partner interest and the City thus presumably had some increased leverage to demand payment—were any meaningful steps taken toward collection. In 1998 and 2005 the City actually advanced monies (as steam prepayments) to Akron Thermal despite the fact that Akron Thermal had never made its rent or franchise fee payments. The Debtor relies heavily on equitable principles of waiver and estoppel in arguing against implication of a substantial compliance requirement. Debtor's Proposed Findings of Fact ¶¶ 221-22.

        2.     ***Alternately, the Debtor extended the Lease when it filed the Lease Adversary Action.***

Because the Lease was not terminated prior to the Petition Date, when Akron Thermal filed chapter 11 any remaining rights under that document became property of the bankruptcy estate. While it is true that those rights are usually defined in the first instance by state law, *see United States v. Butner*, 440 U.S. 48, 55 (1979), where a specific provision of the Bankruptcy Code addresses what the debtor may do with respect to those rights, federal bankruptcy considerations come into play. *Compare id.* (state law determines whether a creditor has a

32

perfected security interest "unless some federal interest requires a different result"). In light of those considerations, the Court concludes, as an alternate holding, that even if Akron Thermal did not effectively extend the Lease term prior to filing its chapter 11 petition, it did effect such an extension by filing the Lease Adversary Action.

The Operating Lease does not prescribe any one method of extending the lease term under Section 2. The filing of the Lease Adversary Action clearly put the City on notice that as a debtor in bankruptcy Akron Thermal was seeking to preserve its lease extension rights and its option to assume the Lease while in chapter 11. In that context, should this Court still find that Akron Thermal's rights to renew and extend the lease term were limited by an implied condition of substantial compliance with the other lease terms? The Court concludes that it should not.

As previously discussed, the implication of a condition that the tenant not be in substantial default of lease payment terms is premised upon the unfairness of allowing the tenant to extend for a full renewal period the uncertainty of future rental payments. Section 365 of the Code, however, specifically addresses that unfairness: it allows a debtor to assume the contract if, and only if, the debtor can *both* cure the past monetary defaults *and* convince the Court that it is likely the debtor will be able to perform all of its future obligations (monetary or otherwise) under the agreement. [15] Nothing in state contract law or property law corresponds to the assumption rights created under Section 365. In light of that congressional resolution of the fairness issue, the "fundamental fairness" issue is for all intents and purposes mooted. *See also*, 4-68 Collier Bankruptcy Practice Guide ¶ 68.05[3] (Lawrence P. King et al. eds., 15th Ed. Rev.

---

[15] Section 365(d)(3) further protects a lessor against the uncertainty of rents by requiring the debtor to perform on current obligations under the lease. In the present case, Akron Thermal has paid to the City all post-petition rent and franchise fees.

33

2007) (stating "a debtor who has defaulted pre-petition on an unexpired lease may exercise its option to renew that lease without first assuming the lease or curing any pre-petition defaults," conditioned on the "eventual assumption of the lease . . . and cure of all defaults in compliance with the requirements of section 365(b)(1).") (citing *In re Revco D.S., Inc.*, 111 B.R. 626 (Bankr. N.D. Ohio 1989); *In re Cook United, Inc.*, 53 B.R. 342 (Bankr. N.D. Ohio 1985); *In re Circle K Corp.*, 190 B.R. 370 (B.A.P. 9th Cir. 1996); *In re Webster Clothes, Inc.*, 36 B.R. 260 (Bankr. D. Md. 1984)).[16]

## B. Liquidated Cure Amounts

### 1. Principal Amounts of Liquidated Cure Items

Consistent with the Findings of Fact above, the Court finds that the following amounts must be paid by the Debtor to the City to cure the principal amount of monetary defaults:

| | |
|---|---|
| Lease Payments | $986,891.25 |
| Franchise Fees | $93,035.37 |
| Real Estate Taxes-Parcel I | $65, 396.52 plus any amounts paid by the City to Summit County on real estate taxes due and owing for the first half of 2007 forward[17] |
| Real Estate Taxes-Parcel II | $7942.58 plus any amounts paid by the City to Summit County on real estate |

---

[16] The City argues that *Revco* is inapplicable because in that case the debtor was allowed to renew after filing its chapter 11 case whereas Akron Thermal attempted to renew prior to its filing. This is an example of a distinction without a difference. This Court will not burden what would otherwise have been Akron Thermal's extension rights under *Revco* simply because Akron Thermal not only took action in bankruptcy court to assert those rights but also acted prior to the Petition Date in furtherance of lease extension.

[17] As with the post-petition interest component, see note 5 above, the City seems to have the misconception that post-petition defaults cannot be part of the cure. Mr. Turner's expert report indicates that the City paid the second half 2006 taxes of the real estate. The Court has included those amounts in setting for the monetary cure for the Debtor's failure to pay real estate taxes.

34

|                                          | taxes due and owing for the first half of 2007 forward |
| ---------------------------------------- | ------------------------------------------------------ |
| 1998 Amendatory Agreement                | $357,716.04                                            |
| 1998 Steam Discount                      | $24,683.86                                             |
| 2005 Amendatory Agreement                | $200,000[18]                                           |
| 2005 Steam Discount                      | $10,526.31                                             |
| Total                                    | $ 1,746,191.93 plus any upwards adjustment for real estate tax payments |

2.      ***Interest on Principal Amounts***

The City argues it is entitled to statutory interest on monetary defaults.  The Debtor

argues that nothing in the Lease calls for that interest.  The Court agrees with the City on this

issue, which unlike the "implied substantial performance" issue does not require a judicial

rewriting of the agreement.  The awarding of interest in a breach of contract action is governed

by O.R.C. 1343.03(A) which states, in pertinent part:

> In cases other than those provided for in Section
> 1343.01 and 1343.02 of the Revised Code, when
> money becomes due and payable upon any bond, bill,
> note or other instrument of writing written all
> judgments, decrees, and orders of any judicial tribunal
> for the payment of money arising out of…a contract
> or other transaction, the creditor is
> entitled to interest at the rate per annum determined
> pursuant to Section 5703.47 of the Revised Code,
> unless a written contract provides a different rate of

---

[18] Akron Thermal argues that because the "credit" mechanism for repaying this advance extends through October, 2008, there is no liquidated cure for the 2005 Amendatory Agreement.  There was no evidence Akron Thermal has been crediting City steam accounts or providing the 5% discount; Akron Thermal *has*, however, acknowledged that during the post-petition period the City has paid Akron Thermal for the City's use of steam on a current basis.  If Akron Thermal wishes to apply 50% credits on a go-forward basis to the City's monthly steam bills and give the City a 5% steam discount on those same bills, the Court will consider at any plan confirmation hearing whether that reduces the cash cure obligations under the 2005 Amendatory Agreement.

> interest in relation to the money that becomes due and
> payable, in which case the creditor is entitled to
> interest at the rate provided in that contract.

Ohio courts have consistently held that this statute provides for prejudgment interest in contract cases from the date the claim accrued or the date the conditions of the contract required payment. *See, e.g., O'Nesti v. DeBartolo Realty Corp*., 163 Ohio App. 3d 609, 634, 839 N.E.2d 943, 961 (7th Dist. 2005) (citing *Landis v. Grange Mut. Ins. Co*, 82 Ohio St.3d 339, 341, 695 N.E.2d 1140 (1998)). Demand for payment is not a requirement for prejudgment interest. *Id.* at 635-36; 839 N.W.2d at 963.

The Debtor is therefore obligated, upon assumption of the Lease, to pay the following interest amounts to the City, which Mr. Turner calculated as of the Petition Date:

| | |
|---|---|
| Lease Payments | $291,061.08 |
| Franchise Fees | $23,146.28 |
| Real Estate Taxes-Parcel I | $777.49 |
| Real Estate Taxes-Parcel II | $ 90.15 |
| 1998 Amendatory Agreement | $ 221,644.82 |
| 1998 Steam Discount | $8,621.94 |
| Total | $545,341.76 |

Although Mr. Turner did not calculate post-petition interest, the City is entitled to that in the context of a Section 365 assumption of the Lease. If this case proceeds to a confirmation hearing, the City will be allowed to introduce evidence of post-petition interest.

36

### C. Other Potential Cure Obligations of the Debtor

The Debtor disputes most, if not all, of the City's remaining allegations of default. In the context of Section 365 assumptions, the "non-bankruptcy party to an unexpired lease or executory contract 'bears [the] burden to assert any defaults prior to the assumption.'" *In re Ali Properties, Inc.*, 334 B.R. 455, 460 (Bankr. D. Kan 2005) (*quoting In re Cellnet Data Systems, Inc.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004). *See also In re F.W. Restaurant Associates, Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995).

### 1. Deferred Maintenance

Section 9 of the Operating Lease provides in relevant part that the "Tenant shall be responsible for, and shall pay the cost of, all maintenance of the System and the Leased Property."[19] The City contends that the word "maintenance" means "…the work of keeping a building, machinery, etc. in a state of good repair," City's Exhibit MMMM, and that the Debtor has failed to meet its obligation to maintain the leased premises. The City's evidence at the hearings focused on three major areas: 1) automatic controls at the RES Facility; 2) modification of the header for Boiler 2; and 3) the abandonment of the City Hospital Condensate Line. On March 20, 2008, the City filed a motion to reopen the record (Dkt. #370) (the "Motion to Reopen") with respect to the Assumption Motion and the City's deferred maintenance claims. The City wishes to introduce evidence relating to a fourth maintenance issue, namely

---

[19] The term "System" is defined in the Operating Lease to include "a certain steam power plant formerly owned by BF Goodrich Company (the 'Annex'), a certain solid waste to energy incinerator facility (the 'RES', and together with the Annex, the EDS [defined earlier as "the district heating and cooling system that supplies to approximately 200 customers steam, hot water and chilled water for the heating and cooling of businesses and residences located in the Central Business District of the City of Akron"], and the steam and water main distribution system located throughout the Seller's municipal are and associated underground piping, manholes, and related facilities . . . in Akron, Ohio.

37

maintenance of the steam distribution lines.

### a. Automated Controls

Mr. Conley's testimony with respect to automated controls clearly showed that he

believes there are modern automated control systems rendering obsolete any automated controls

that were in place in August of 1997, when the Operating Lease was signed. The City has not,

however, cited any law for the proposition that "maintenance" of leased property means that the

tenant must keep the premises in like-new or nearly new condition or must take advantage of

new technology to make the leased property operate at peak efficiency. Section 18 of the

Operating Lease states that upon expiration or termination of the agreement the tenant was to

surrender the leased assets as follows:

> (i) the Leased Property to Landlord broom-clean and in its current
> operating condition existing on the Lease Closing Date, subject to
> any Improvements made during the Term, normal wear and tear
> excepted.
> . . .
> (iii) the Acquired Equipment in good order and repair, normal
> wear and tear and insured casualty excepted.

The exception for wear and tear in the surrender provision supports the Debtor's argument that it

is not obligated to *improve* the leased boilers in order to satisfy the "maintenance" responsibility

under Section 9 of the Operating Lease. *See Ohio Environmental Development Ltd. V.

Envirotest Systems Corp.,* 478 F. Supp.2d 963, 970 (N.D. Ohio 2007) ("'The most reasonable

and logical interpretation of the exception for obsolescence and ordinary wear and tear is simply

that the tenant is not required to keep the premises in like-new or nearly new condition, but

rather is required merely to keep it serviceable and in good repair.'" (*quoting Capitol Funds, Inc,

v. Arlen Realty, Inc.*, 755 F.2d 1544, 1549 (11th Cir. 1985)). The Court therefore concludes that

the Debtor is not obligated, as part of the assumption cure, to purchase and install the automated

controls described in Mr. Conley's report.

### b. Raising the Header on Boiler 2

Here again the City argues through Mr. Conley that Akron Thermal should be required to change a piece of leased equipment from the condition it was in at the time the Operating Lease was signed. The Court finds as a matter of law that such a change is not required, especially where, as the Court's Findings of Fact, *supra,* indicate, the manner in which Akron Thermal operates Boiler 2 (at a full capacity and burning the wood chips/tire-derived fuel mixture) alleviates the problems that resulted in the raising of the header on Boiler 1 prior to Akron Thermal's operation of the RES Facility.

### c. The City Hospital Condensate Return Line

At this point, the record is unclear whether the City Hospital Condensate Return Line was operating in August of 1997 when the Operating Lease was signed. If it was not in operation at the point of lease execution, there arguably is nothing that Akron Thermal needs to "maintain" with respect to that line. The City therefore has not shown that the decision in 2007 to modify the Energy System by shutting down that return line constitutes a breach of Akron Thermal's maintenance obligations. Because of the interlocutory nature of this opinion, if the Court proceeds to consider the Debtor's amended plan of reorganization, the City will be allowed at to present additional evidence on this question, as will the Debtor. This is an issue of historical fact, however, that should be susceptible to stipulation. If the Energy System included a functioning City Hospital Condensate Return Line at the time the Operating Lease was executed, the Debtor's plan of reorganization must address the resulting issues.

39

### d. The City's Motion to Reopen: Alleged Failure to Maintain Distribution Lines

The City wishes to introduce evidence relating to an underground fire in November of 2007 that resulted in a power outage to downtown Ohio Edison customers. The City contends that an apparent leak in Akron Thermal's steam distribution line is related to the fire and that the leak resulted from Akron Thermal's failure to adequately maintain their steam distribution lines. The Court will address hearing needs with respect to this issue at the August 29, 2008 telephonic status conference that has been scheduled for Akron Thermal matters

### 2. Environmental Obligations

The City argues that Akron Thermal is in default of the Lease by virtue of the Boiler 32 NOV and that this "environmental condition" must be cured before the lease can be assumed. City's Proposed Findings of Fact and Conclusions of Law, Dkt 360 at ¶ 82. The City points to Section 3.2(c) of the Operating Lease, which provides:

> Tenant shall pay to Landlord and/or assume all liability for, as the case may be, as additional rent during the Term all of the following:
> . . .
> (c) all of the following liabilities of Landlord (the "Assumed Liabilities") which are hereby expressly assumed and shall be satisfied and discharged by the Tenant: . . .(ii) any liability or obligation relating to or arising from any Environmental Condition as provided in Section 37 below, except to the extent limited by the terms of Section 37.

Section 37 defines "Environmental Condition" to include the release of any contaminant.

The Court has found that the City has not made any cash payments in an attempt to cause Boiler 32 to comply with the standards set forth in the DOJ Letter. Therefore, Akron Thermal's obligation under the Operating Lease is simply to assume liability for any future liability or

obligation that the City might have. Almost by definition, Akron Thermal is not currently in

breach of such an obligation.

The City further points to Section 4.2 of the Operating Lease, which states in part:

> Tenant . . .shall comply with all laws, rules, regulations, orders, and other
> requirements applicable to the Leased Property imposed by any
> Governmental Authority having jurisdiction with respect thereto,
> including, without limitation, those pertaining to the condition of
> the environment (collectively, "Applicable Legal Requirements").

The City's argument here assumes what Akron Thermal disputed almost immediately upon

receipt of the Boiler 32 NOV, namely that the NSPS apply to the 1995 restart of that equipment.

The Boiler 32 NOV does not have the force of a law, rule, regulation, order, or other requirement

imposed upon the Debtor:

> No legal consequences flow from the issuance of [an] NOV
> because it merely notifies [a company] of their [sic, its] existing
> obligations under the CAA [Clean Air Act]. It does not impose
> any new obligations or penalties on [a company], and does not
> even direct or request that [the company] correct the alleged
> violations. In order to compel action or impose penalties, EPA
> would have to pursue further enforcement action, at which time
> [the company] would have an opportunity to raise [its] defenses….
> Absent such action, the findings and conclusions in the NOV have
> no direct and immediate . . . effect on the day-to-day business of
> [the company].

*Royster-Clark Agribusiness v. Johnson, Administrator, USEPA*, 391 F. Supp. 2d 21 at fn 16

(internal quotes and citations omitted.) Section 4.2 of the Operating Lease allows Akron

Thermal to "contest any Applicable Legal Requirements by appropriate proceedings duly

instituted and diligently prosecuted at Tenant's expense". Unless and until U.S. EPA institutes

an enforcement action and Akron Thermal is the subject of a final decision finding a violation of

41

the Clean Air Act, there is no default. [20]

Although this Court does not have jurisdiction to determine whether the resumption of Boiler 32 operations in 1995 trigger "new use" obligations under the Clean Air Act, the Court of necessity has considered whether it is more likely than not that Akron Thermal will be able to resolve this case with U.S.EPA on terms Akron Thermal finds economically acceptable or that any final determination of the "new source" issue by a court of competent jurisdiction will not be adverse to Akron Thermal. Based upon the testimony of Mr. Taylor, the only expert who addressed that issue, the Court believes that Akron Thermal is likely to obtain a favorable resolution of the Boiler 32 issue.

***CONCLUSION***

While providing answers to several of the many issues raised by the parties regarding the Assumption Motion, this opinion is clearly interlocutory in nature. Additional hearing needs relating to all matters in the case will be addressed at the previously scheduled April 29, 2008 status hearing.

###

---

[20] The Court does believe that the environmental issue raised by the Boiler 32 NOV would create an issue of feasibility at any plan confirmation hearing in this case. It therefore expects any amended plan of reorganization and disclosure statement that the Debtor files to provide specifics on the status of the Debtor's negotiations with U.S.EPA and the source of funding for installing new equipment pursuant to a settlement or for contesting any enforcement action that the U.S. EPA may pursue.

cc:  via electronic delivery

| Daniel R Swetnam | *as counsel for* | Akron Thermal, Limited Partnership |
| Tyson A. Crist | *as counsel for* | Akron Thermal, Limited Partnership |
| Robert M Stefancin | *as counsel for* | Akron Thermal, Limited Partnership |
| Eric E Skidmore | *as counsel for* | City Of Akron |
| Brian K Skidmore | *as counsel for* | City Of Akron |
| Thomas A. Skidmore | *as counsel for* | City Of Akron |
| Joseph F. Hutchinson | *as counsel for* | Official Committee Of Unsecured Creditors |
| Kelly S. Burgan | | |

07-51884-mss    Doc 390    FILED 04/25/08    ENTERED 04/25/08 19:57:24    Page 43 of 43